AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. 2:21-mj-5672 |
| 7727 Lankershim Blvd, Apartment 168 North Hollywood, California 91605 | ) | |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A | Possession of Child Pornography |
| 18 U.S.C. § 2251 | Production of Child Pornography |
| 18 U.S.C. § 2422(b) | Coercion and Enticement of a Minor for Illegal Sexual Activity |
| 18 U.S.C. § 2261A(2) | Cyberstalking |
| 18 U.S.C. § 1470 | Transfer of Obscene Matter to a Minor |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
GITANA GOTAY
*Applicant's signature*

_____
GITANA GOTAY, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Honorable Steve Kim
*Printed name and title*

AUSA: Bruce Riordan (213-894-0840)

**ATTACHMENT A-1**

**PREMISES TO BE SEARCHED**

The premises to be searched is the property located at 7727
Lankershim Blvd, Apartment 168, North Hollywood, California
91605 (the "SUBJECT PREMISES").  The SUBJECT PREMISES is a
residence located on the first level of a multi-story apartment
complex, and its primary entrance is in the interior of the
complex.  The unit number "168" is clearly displayed in dark
lettering on the residence's light brown door.  The SUBJECT
PREMISES includes any individual reasonably believed to be a
resident of the SUBJECT PREMISES that is inside the SUBJECT
PREMISES at the time of the search.




**ATTACHMENT B**

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18 U.S.C. § 2252A, Possession of Child Pornography, 18 U.S.C. § 2251, Production of Child Pornography, Title 18 U.S.C. § 2422(b), Coercion and Enticement of a Minor for Illegal Sexual Activity, Title 18 U.S.C. § 2261A(2), Cyberstalking, and Title 18 U.S.C. § 1470, Transfer of Obscene Matter to a Minor (collectively, the "SUBJECT OFFENSES"), namely:

a.    Child pornography, as defined in Title 18, United States Code, Section 2256(8).

b.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in Title 18, United States Code, Section 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, in interstate commerce, including by computer, involving any visual depiction

i

of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(B).

d.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

e.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that discuss, depict, or evidence any minor engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

f.    Any and all records, documents, programs, applications, messages, notes, materials, or items that are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

g.    Any and all records, documents, programs, applications, notes, materials, or items, including electronic mail and electronic messages, which discuss or otherwise may be related to the sex exploitation of children.

h.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to KIK.

i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

j.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT PREMISES.

k.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found inside the SUBJECT PREMISES.

l.   Any digital device, including but not limited to an Apple iPhone, which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

m.   Any phone book, call log, or call records, digital or otherwise.

n.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

        ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

        vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii.    records of or information about
Internet Protocol addresses used by the device;

        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,

documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar

facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

      b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

            i.   The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the list of items to be seized.

            ii.  The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

            iii. The search team may use forensic examination
     and searching tools, such as "EnCase," "FTK" (Forensic Tool
Kit), and Griffeye, which tools may use hashing and other
sophisticated techniques, including to search for known images
of child pornography.

      c.   If the search team, while searching a digital
device, encounters immediately apparent contraband or other

evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

h. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a. Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   During the execution of this search warrant, with respect to an individual reasonably believed to be a resident of the SUBJECT PREMISES and/or SUBJECT PERSON, and is the user of a biometric sensor-enabled device that is located at the SUBJECT PREMISES and/or is on SUBJECT PERSON's person, and which falls within the scope of the warrant, law enforcement personnel are authorized to: (1) direct the individual to depress the thumb- and/or fingerprints of the individual onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the individual with his/her eyes open (which law enforcement may direct) to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Gitana Gotay, being duly sworn, declare and state as follows:

## I. <u>INTRODUCTION</u>

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since May 2017. I am currently assigned to the Los Angeles Field Office where I have been working on the Human Trafficking/Violent Crimes Against Children Squad since October 2021.  Through my work with the FBI, I have participated in investigations and search warrants related but not limited to violations of Title 18 U.S.C. § 2252A, Possession and Production of Child Pornography, and Title 18 U.S.C. § 2422(b), Coercion and Enticement of a Minor for Illegal Sexual Activity.

2. Prior to becoming an FBI SA, I was a California POST Certified Peace Officer for the Los Angeles Police Department ("LAPD") for three and half years. In my capacity as an LAPD Peace Officer, I was assigned for three months to the 77th Division Vice Unit, where I conducted numerous human trafficking-related detentions, investigations and arrests as well as received several hours of formal and informal training from trained LAPD Human Trafficking Experts and field supervisors.  Additionally, while working at 77th Division, on both patrol and in my capacity with the 77th Division Vice Unit, I assisted in multiple investigations related to the sexual exploitation of children.

3.   As both an FBI SA and LAPD Peace Officer, I have received informal and formal training regarding the exploitation of children and consulted with numerous experts on the topic. Through my training, conversations and field experience, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children and how people use electronic devices and the Internet to commit such crimes.

## II. <u>PURPOSE OF AFFIDAVIT</u>

4.   This affidavit is made in support of an application for a warrant to search:

a.   the premises located at 7727 Lankershim Blvd, Apartment 168, North Hollywood, California 91605 (hereafter the "SUBJECT PREMISES"), more fully described in Attachment A-1, and;

b.   the person of Edwin Enrique ACEITUNO ("ACEITUNO"), also referred to as the "SUBJECT PERSON," date of birth December 23, 1995, more fully described in Attachment A-2. Attachments A-1 and A-2 are incorporated herein by reference.

5.   The requested warrants seek authority to seize evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. § 2252A, Possession of Child Pornography, Title 18 U.S.C. § 2251, Production of Child Pornography, Title 18 U.S.C. § 2422(b), Coercion and Enticement of a Minor for Illegal Sexual Activity, Title 18 U.S.C. § 2261A(2), Cyberstalking, and Title 18 U.S.C. § 1470, Transfer of Obscene Matter to a Minor

(collectively, the "SUBJECT OFFENSES"), more fully described in Attachment B, which is attached herein by reference.

6. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7. On December 9, 2021, in connection to an investigation conducted by FBI Salt Lake City, the United States District Court for the District of Utah issued a warrant for Edwin Enrique ACEITUNO ("ACEITUNO") for violations of Title 18 U.S.C. § 2251(a), (e), Production of Child Pornography, Title 18 U.S.C. § 2422(b), Coercion and Enticement of a Minor for Illegal Sexual Activity, Title 18 U.S.C. § 2261A(2), Cyberstalking, and Title 18 U.S.C. § 1470, Transfer of Obscene Matter to a Minor (Case No. 2:21-CR-00512, Warrant No. W205333498).

8. After determining that ACEITUNO resided in or near Los Angeles, California, more specifically at 7727 Lankershim Blvd, Apartment 168, North Hollywood, California 91605 (the "SUBJECT PREMISES"), FBI Salt Lake City requested assistance from FBI Los Angeles in effecting ACEITUNO's arrest. Additionally, in their request for assistance, FBI Salt Lake City provided information

that there was reason to believe that ACEITUNO's electronic devices may contain further evidence related to ACEITUNO's indictment as well as evidence of additional crimes committed by ACEITUNO against victims not yet known and/or identified by law enforcement.

9.    Based on my knowledge of this investigation, which is outlined in further detail below, as well as my training and experience, I believe probable cause exists that ACEITUNO used a cell phone and/or other electronic devices to send and receive sexually explicit messages and videos with a female minor, date of birth October 6, 2006, residing in Utah (hereafter "Victim 1"), and that these devices may contain evidence not only of the offenses perpetrated by ACEITUNO against Victim 1, but also against additional victims that have not yet been identified. Furthermore, this affidavit will show that probable cause exists that these devices are likely to be found at ACEITUNO's residence, the SUBJECT PREMISES, and/or on or near ACEITUNO's person.

### IV. <u>DEFINITION OF TERMS</u>

10.    The following terms have the indicated meaning in this affidavit:

a.    The terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in Title 18, United States Code, Section 2256.

b.    The term "computer" is defined as set forth in Title 18, United States Code, Section 1030(e)(1).

4

c.   The term "email" (electronic mail) is defined as the messages sent from one person to another via a computer. Email may also include files sent as attachments to or embedded within text messages.  Email can also be sent automatically to a large number of addresses via a mailing list.

d.   The term "Internet" is defined as the worldwide network of computers—a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of computer networks, online services, and single user components.  In order to access the Internet, an individual computer or digital device user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

e.   The term "Internet Protocol" ("IP") is defined as the primary protocol upon which the Internet is based.  IP allows a packet of information to travel through multiple networks (groups of linked computers) on the way to its ultimate destination.

f.   The term "IP Address" is defined as a unique number assigned to each computer or digital device directly connected to the Internet.  Each computer or device connected to the Internet is assigned a unique IP address while it is connected (for example, 172.191.142.150).  The IP address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning

that the IP address is only assigned for the duration of that
online session.

g.   The term "Internet Service Provider" ("ISP") is
defined as a business that allows a user to dial into or link
through its computers thereby allowing the user to connect to
the Internet for a fee.  ISPs generally provide only an Internet
connection, an electronic mail address, and maybe Internet
browsing software.  A user can also connect to the Internet
through a commercial online service such as AT&T, Verizon, or
Time Warner Cable.  With this kind of connection, the user gets
Internet access and the proprietary features offered by the
online service, such as chat rooms and searchable databases.

h.   The term "Cloud Storage" is defined as a network
of online storage where data is saved in virtual storage that is
hosted by third parties.  The hosting companies operate large
data centers, possibly across multiple servers.  Cloud storage
allows users to save files and data online and access their
information from anywhere using any digital device with an
Internet connection.

i.   The terms "jpeg," "jpg," "gif," "bmp," and "art"
are defined as graphic image files, namely, pictures.

j.   The terms "mpeg," "mpg," "mov," "avi," "rm," and
"wmv" are defined as video or movie files.  To use these video
files, one needs a personal computer or other digital device
with sufficient processor speed, internal memory, and hard disk
space to handle and play typically large video files.  One also
needs a video file viewer or client software that plays video

files.  One can download shareware or commercial video players from numerous sites on the Internet.

        k.    The term "open source" is defined as software that includes a free license; in other words, it is freely available to everyone using the Internet.

        l.    The term "chat" means any kind of communication over the Internet that consists of the real-time transmission of messages between two or more users.  Chat messages enable participants to respond quickly to one another and in a format that is similar to an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and e-mail.

## V.   BACKGROUND ON USE OF COMPUTERS, CHILD PORNOGRAPHY, AND FILE SHARING THROUGH MESSENGER APPLICATIONS

     11.   Based upon my training and experience in the investigation of child pornography and information relayed to me by other law enforcement officers involved in the investigation of child pornography offenses generally, I know the following information about the use of computers and child pornography:

     12.   Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can scan these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child

exploitation images and videos with other Internet users worldwide.

13.   Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users frequently transfer files from one location to another, or from one digital or storage device to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer and digital device users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography is extremely mobile and such digital files are easily reproduced, transported, and stored.  For example, with the click of a button, someone trading images and videos containing child pornography with others through an online instant messaging application can be copied and put onto other digital devices or media storage devices such as external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital

device that allows the user to access and view files on the Internet.

14. A growing phenomenon in mobile devices and smart phones is the use of applications, commonly known as "apps," to communicate between users. One such "app" is Snapchat. From my review of publicly available information provided by Snapchat about its service, I am aware of the following about Snapchat:

a. Snapchat is a mobile application made by Snap Inc. and available through the iPhone App Store and Google Play Store. The Snapchat app provides users a way to share moments with photos, videos, and chats.

b. Snapchat users can create Snaps which are photos or videos taken using the Snapchat app's camera on an individual's mobile device, and may be shared directly with the user's friends, or in a Story (explained below) or Chat.

c. A user can add Snaps to their "Story." A Story is a collection of Snaps displayed in chronological order. Users can manage their privacy settings so that their Story can be viewed by all Snapchatters, their friends, or a custom audience. A user can also submit their Snaps to a crowd-sourced service "Our Story," which enables their Snaps to be viewed by all Snapchatters in Search and Snap Map.

d. Memories is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. Content saved in Memories is backed up by Snap and may remain in Memories until deleted by the user. Users may encrypt their

content in Memories (called "My Eyes Only"), in which case the content is not accessible to Snap and cannot be decrypted by Snap.

e.   A user can type messages, send Snaps, audio notes, and video notes to friends within the Snapchat app using the Chat feature. Snapchat's servers are designed to automatically delete one-to-one chats once the recipient has opened the message and both the sender and recipient have left the chat screen, depending on the user's chat settings.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   Indictment of ACEITUNO by District of Utah

15.   On August 25, 2021, the parent of Victim 1, a resident of Utah, reported to law enforcement the discovery of inappropriate pictures and conversations on Victim 1's cell phone between Victim 1 and an adult male, who was later identified by investigators as ACEITUNO (the "SUJBECT PERSON").

16.   On September 13, 2021, Victim 1 was interviewed by law enforcement at a Children's Justice Center.  The following is a brief summary of that interview:

Victim 1 believed that she initially met ACEITUNO two or three years ago on Instagram, and in January of 2021, reconnected with ACEITUNO on Snapchat.  One or two months after they reconnected, ACEITUNO, who was aware that Victim 1 was a minor, began to ask and force Victim 1 to do sexual things, including forcing Victim 1 to put her fingers into her rectum, eat her own menstrual blood, drink her own urine, splash her urine on her face, and eat her own feces.

Victim 1 explained that if she refused to do these things, ACEITUNO threatened to rape her and/or indicated he would harm Victim 1's family.  Additionally, ACEITUNO would "guilt trip" Victim 1 by informing her of the other girls willing to do so for him and about "all the different girls [ACEITUNO] dated and had sex with," including "other girls that were fifteen and other teenagers."

While Victim 1 and ACEITUNO had communicated via FaceTime, they primarily communicated by sending messages and videos through Snapchat, which Victim 1 set to make her messages/videos disappear once she sent them.  Victim 1 indicated that during the course of these conversations, ACEITUNO would send videos of him masturbating.

17.  Following the interview of Victim 1 on September 13, 2021, investigators received consent to conduct a forensic examination of Victim 1's phone.  The forensic examination of Victim 1's phone did not locate any sexually explicit images or videos of Victim 1, which the investigators noted aligned with Victim 1's statements that she took steps to delete such; however, the examination did reveal several sexually explicit videos of ACEITUNO, including several videos in which ACEITUNO was featured masturbating.  Additionally, several of the videos sent by ACEITUNO had explicit messages written as banners across the video images.  For example, one video was overlaid with text that read, "I will make sure your asshole is stretched, ripped, purple and bleeding from the deep anal I will give you.  I'm gonna penetrate your asshole so hard you're gonna beg for me to

11

pull this man cock out and stop destroying that little asshole," and on another video the text read, "I wanna tie you up and rape you brutally til I cum."  Further, some of the videos were overlaid with text that explicitly indicated that ACEITUNO was aware that Victim 1 was a minor.  For example, on one video the text read, "Rub that teen pussy for me," and on another video, "You like that your little teen body makes this adult cock hard for your underage holes."

18.  Following the forensic examination of Victim 1's phone, investigators subpoenaed Snap, Inc. for the Snapchat accounts associated with ACEITUNO (Snapchat user "Koopa-Goomba") and Victim 1 (Snapchat user "Kaylee1234100").  Pursuant to the subpoena, Snap, Inc. responded to the request, but no sexually explicit images of Victim 1 and/or conversations between Victim 1 and ACEITUNO were located.  Further, Snap, Inc.'s response indicated that the Snapchat account for "Koopa-Goomba" was deleted on August 25, 2021, which was the same day that Victim 1's family contacted law enforcement regarding the explicit messages.

19.  On December 8, 2021, in connection to FBI Salt Lake City's investigation into ACEITUNO, the United States District of Utah indicted ACEITUNO for violations of Title 18 U.S.C. § 2251(a), (e), Production of Child Pornography, Title 18 U.S.C. § 2422(b), Coercion and Enticement of a Minor for Illegal Sexual Activity, Title 18 U.S.C. § 2261A(2), Cyberstalking, and Title 18 U.S.C. § 1470, Transfer of Obscene Matter to a Minor (Case No. 2:21-CR-00512), and on December 9, 2021, a warrant was

issued for ACEITUNO's arrest (Warrant No. W205333498).  I have
obtained and reviewed file copies of the Indictment and Arrest
Warrant and they are attached to this affidavit as Exhibits A
and B, respectively, and incorporated herein by reference.

20.  Based on the aforementioned investigation, as well as
my training and experience, I believe probable cause exists that
ACEITUNO's cell phone and other electronic devices may contain
pertinent images, videos and/or conversations related to the
SUBJECT OFFENSES that ACEITUNO committed against Victim 1.
Additionally, based on my training and experience, I know that
images can stay in the Snapchat application on the receiver's
phone even if the sender has deleted the images on their end.
Moreover, because child pornography is valuable to individuals
with a sexual interest in children, there's reason to suspect
ACEITUNO may have kept the photos even if Victim 1 did not.
Further, based on Victim 1's statements that ACEITUNO claimed to
have "other girls that were fifteen and other teenagers" who
ACEITUNO "had sex with," I believe ACEITUNO's electronic devices
may contain evidence of crimes ACEITUNO perpetrated against
other minors yet to be identified as victims.

B.    Identification of SUBJECT PREMISES

21.  According to database searches and the California
Department of Motor Vehicles, ACEITUNO resides at 7727
Lankershim Blvd, Apartment 168, North Hollywood, California
91605 (the "SUBJECT PREMISES").

22.  On December 16, 2021, members of FBI Los Angeles
visited the SUBJECT PREMISES, and spoke with Edwin Aceituno,

13

ACEITUNO's father.  According to Edwin Aceituno, ACEITUNO resides at the SUBJECT PREMISES, but was not home at the time of the investigators' visit.

23.  Based on my knowledge that ACEITUNO resides at the SUJBECT PREMISES, as well as my training and experience, I believe probable cause exists that ACEITUNO's cell phone and other electronic devices will be located at the SUBJECT PREMISES and/or on or near ACEITUNO's person.

## VII. TRAINING AND EXPERIENCE ON INDIVIDUALS WHO HAVE SEXUAL INTEREST IN CHILDREN

24.  Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that there are certain characteristics common to individuals with a sexual interest in children and images of children:

a.   Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, in person, in photographs, or in other visual media; or from literature describing such activity.

b.   Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media.  This includes

collecting images or videos traded with other like-minded individuals through online messaging applications such as KIK. Individuals who have a sexual interest in children or images of children oftentimes transfer, maintain, and store such materials, and use them for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Individuals who have a sexual interest in children or images of children sometimes possess hard copies of child pornography, such as pictures, films, video tapes, magazines, negatives, photographs, and etcetera. As digital technology has developed, individuals with a sexual interest in children or images of children have become much more likely to maintain child pornography, including materials they may have obtained from, or shared with, other individuals through chat and file-sharing applications in digital or electronic format, stored either on digital devices or in remote storage locations on the Internet. Regardless of whether these individuals collect their child pornography in hard copy or digital format, they may maintain their child pornography for a long period of time, even years. They usually maintain these collections in a safe, secure, and private environment, such as their homes, vehicles, or nearby, so they can view the child pornography at their leisure. These collections are typically highly valued.

15

d.    Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/ collectors; may conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.  Additionally, individuals who receive or share child pornography with other online users often keep backups and copies of those materials on other digital or storage devices in their homes, cars, or other nearby locations.

e.    Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

25.  Based on my training and experience, as well as my conversations with digital forensics agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via computer.  Electronic files downloaded to a hard drive can be stored for years at little to no cost.  Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that

data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Because computer evidence is recoverable after long periods of time, and because there is probable cause to believe that persons at the SUBJECT PREMISES were once in possession of child pornography and likely obtained it from some as yet unidentified source, there is probable cause to believe that evidence of activity related to the distribution, receipt, and possession and distribution of child pornography will be found at the SUBJECT PREMISES and on the SUBJECT PERSON.

## VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

26.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical

manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

19

d.    Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.[1]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular

---

[1] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

   e. Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and

the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt"

to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

27.  As discussed herein, based on my training and experience I believe that digital devices will be found during the search.

a.   I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features

23

include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

c.   If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement).  Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017).  Apple calls its facial-recognition unlock feature "Face ID."  The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

d.   While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data.  The human iris, like a fingerprint, contains complex patterns that are unique and stable.  Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris

25

using infrared light.  Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels.  A user can register one or both eyes to be used to unlock a device with these features.  To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes.  The device is then unlocked if the camera detects the registered eye.  Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features.  In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features.  Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

28.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

29.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that

biometric features will not unlock a device in some circumstances even if such features have been enabled. This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time. For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

30. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via

biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

31.  For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to the SUBJECT PERSON to be the user of a biometric sensor-enabled device that is (a) located at the SUBJECT PREMISES and (b) falls within the scope of the warrant: (1) compel the use of the person's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know

based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

32.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

## IX. <u>CONCLUSION</u>

33.   Based on the foregoing, there is probable cause to
believe that evidence, fruits and instrumentalities of the
SUBJECT OFFENSES, as described above and in Attachment B, will
be found in a search of the SUBJECT PREMISES, as described in
Attachment A-1, and/or the SUBJECT PERSON, as described in
Attachment A-2 of this affidavit.


_____
GITANA GOTAY,
Special Agent,
Federal Bureau of Investigation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __ day of
December, 2021.


_____
UNITED STATES MAGISTRATE JUDGE

**EXHIBIT A**

ANDREA T. MARTINEZ, Acting United States Attorney (#9313)
CAROL A. DAIN, Assistant United States Attorney (#10065)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

FILED US District Court-UT
DEC 08 '21 PM 05:18

# SEALED

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EDWIN ENRIQUE ACEITUNO,<br><br>Defendant.<br><br>Case: 2:21-cr-00512<br>Assigned To : Barlow, David<br>Assign. Date : 12/7/2021 | INDICTMENT<br><br>VIOLATIONS:<br><br>18 U.S.C. § 2251(a) and (e), PRODUCTION OF CHILD PORNOGRAPHY;<br><br>18 U.S.C. § 2422(b), COERCION AND ENTICEMENT FOR ILLEGAL SEXUAL ACTIVITY;<br><br>18 U.S.C. § 2261A(2), CYBERSTALKING;<br><br>18 U.S.C. § 1470, TRANSFER OBSCENE MATTER TO A MINOR. |

The Grand Jury Charges:

### COUNT I
18 U.S.C. § 2251(a) and (e)
(Production of Child Pornography)

Beginning on or about January, 2021 and continuing until August 25, 2021, in the

District of Utah and elsewhere,

EDWIN ENRIQUE ACEITUNO,

defendant herein, did knowingly employ, use, persuade, induce, entice and coerce a

minor, to wit: Minor 1, to engage in sexually explicit conduct for the purpose of

producing visual depictions of such conduct, and the defendant, EDWIN ENRIQUE

ACEITUNO, knowing and having reason to know that such visual depiction would be

transported and transmitted using any means and facility of interstate and foreign

commerce and in and affecting interstate and foreign commerce; using materials that

have been mailed, shipped, and transported in and affecting interstate and foreign

commerce by any means, including by computer; and the visual depiction was

transported and transmitted using any means and facility of interstate and foreign

commerce and in and affecting interstate and foreign commerce, and attempted to do so;

all in violation of 18 U.S.C. § 2251(a) and (e).

## COUNT II
18 U.S.C. § 2422(b)
(Coercion and Enticement)

Beginning on a date unknown in 2018 and continuing until August 25, 2021, in the

District of Utah and elsewhere,

EDWIN ENRIQUE ACEITUNO,

the defendant herein, using a facility or means of interstate or foreign commerce, did

knowingly persuade, induce, entice, and coerce any individual who has not attained the

age of 18 years, to engage in any sexual activity for which any person can be charged

with a criminal offense, and attempted to do so; all in violation of 18 U.S.C. § 2422(b).

## COUNT III
18 U.S.C. § 2261A(2)
(Interstate Stalking)

Beginning on or about January, 2021 and continuing until August 25, 2021, in the

District of Utah and elsewhere,

EDWIN ENRIQUE ACEITUNO,

the defendant herein, with the intent to kill, injure, harass, intimidate and place under

surveillance with intent to kill, injure, harass, and cause substantial emotional distress to a

person in another state, namely, Utah, used facilities of interstate or foreign commerce,

including mobile phone applications and other forms of electronic communication, to

engage in a course of conduct that caused substantial emotional distress to the victim,

Minor 1, and placed her in reasonable fear of death or serious bodily injury, and

attempted to do so; all in violation of 18 U.S.C. § 2261A(2).

//////////

//////////

//////////

3

## COUNT IV
### (18 U.S.C. § 1470)
#### (Transferring Obscene Matter to a Minor)

Beginning on or about January, 2021 and continuing until August 25, 2021, in the

District of Utah and elsewhere,

### EDWIN ENRIQUE ACEITUNO,

the defendant herein, did, by means of a facility of interstate commerce, knowingly

transfer obscene matter to another individual who had not attained the age of 16 years,

knowing that the other individual had not attained the age of 16 years, and attempted to

do so; all in violation of 18 U.S.C. § 1470.


A TRUE BILL:

/S/
_____
FOREPERSON OF GRAND JURY


ANDREA T. MARTINEZ
Acting United States Attorney


_____
CAROL A. DAIN
Assistant United States Attorney

4

**EXHIBIT B**

AO 442

# United States District Court

for the

**District of Utah**



UNITED STATES OF AMERICA

V.

**Edwin Enrique Aceituno**

Case No: 2:21-cr-00512

# ARREST WARRANT

To:     The United States Marshal
        and any authorized law enforcement officer

YOU ARE HEREBY COMMANDED to arrest and bring before a United States magistrate judge without unnecessary delay (name of person to be arrested)     EDWIN ENRIQUE ACEITUNO                                                                ,

who is accused of an offense or violation based on the following document filed with the court:

[X] Indictment  [ ] Superseding Indictment  [ ] Information  [ ] Superseding Information
[ ] Complaint  [ ] Order of court  [ ] Violation Notice  [ ] Probation Violation Petition
[ ] Supervised Release Violation Petition

This offense is briefly described as follows:

**Production of Child Pornography; Coercion and Enticement for Illegal Sexual Activity; Interstate Stalking; Transferring Obscene Matter to a Minor**

in violation of     18:2251(a) and (e); 18:2422(b); 18:2261A(2); 18:1470                     United States Code.

| | |
|---|---|
| D. Mark Jones | Clerk of Court |
| Name of Issuing Officer | Title of Issuing Officer |
| *Jessica Lykins* (signature) | December 9, 2021 at Salt Lake City, Utah |
| Signature of Issuing Officer | Date and Location |
| By:     Jessica Lykins
            Deputy Clerk | |

Bail fixed _____ by _____
                                                                                        Name of Judicial Officer

| RETURN |
|---|
| This warrant was received and executed with the arrest of the above-named defendant at _____ |
| |

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST | | |

SEALED

WARRANT